### SOMMERS et al. v. COTTENTIN et al.

(Supreme Court, Appellate Division, First Department. February 11, 1898.)

1. FRAUDULENT CONVEYANCES—PARTICIPATION BY GRANTEES.

 A deed of trust from an insolvent debtor of a portion of his property, consisting of real estate, to secure a portion of his creditors, is not rendered fraudulent and void by his purpose of thereby retaining possession and control, avoiding seizure and interference, and hindering and delaying other creditors, where the debts thus secured are all bona fide, and the trustee and the creditors named therein are not parties to the unlawful purpose.

2. SAME—EVIDENCE.

 In such a case, the mere fact that the same attorney represents the debtor and all the creditors secured by the trust deed, and that the trustee is a clerk in his office, in the absence of any showing that the attorney or trustee knew of or participated in the debtor's unlawful and ulterior purpose, does not charge the creditors with any such knowledge or participation.

3. SAME—CHANGE OF POSSESSION—PRESUMPTION.

 A party claiming under a sale of personal property not accompanied with a complete change of possession may rebut a resulting presumption of fraud by proving that the transaction was in good faith and without any intent to defraud creditors,—not by showing some excuse why there had not been a change of possession, but by proper and relevant testimony to show the real bona fides of the transaction.

4. SAME.

 A bona fide creditor accepted from the debtor, in cancellation of the debt, a bill of sale of certain fixtures and stock in trade of a restaurant business,

roughly estimated to equal in value the amount of the debt. The debtor remained on·the premises. Thereafter, finding that the estimate of value had been excessive, the creditor retransferred the property, revived the debt, and came in under a trust previously created by the debtor for other creditors. *Held* that, even if it were necessary for him to furnish any excuse for the continued apparent possession of the debtor prior to the retransfer, it was sufficient for him to show that he took possession as far as he could without destroying the business, that he put the debtor in charge on a salary, and that he took the proceeds, and held the business, until satisfied that it was to his interest, regardless of the debtor, to surrender it back, revive the indebtedness, and come in under the trust.

5. SAME—HUSBAND AND WIFE—IMPUTED FRAUD.
Even though a wife is a bona fide creditor of her husband, yet if she leaves it entirely to him as her agent to make such disposition of his affairs in reference to her claim as he sees fit, a fraudulent purpose on his part in executing to her a chattel mortgage is imputable to her, and vitiates the transaction.

6. SAME—RESULTING TRUST.
In a chattel mortgage given by a debtor upon a portion of his property, to a trustee for a portion of his bona fide creditors, a mere provision for a resulting trust to the debtor in any overplus raises no inference of unlawfulness, and no imputation of assent or complicity, on the part of the creditors thus preferred, in any ulterior and unlawful purpose of the debtor.

Cross appeals from special term.

Action by Isaac Sommers and others against Leon Cottentin and others. From interlocutory and final judgments entered on reports of referees, all parties appeal. Reversed in part.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, and O'BRIEN, JJ.

G. C. Comstock and F. Spiegelberg, for plaintiffs.
Louis Marshall, for defendants.

PATTERSON, J. These are cross appeals, the defendants appealing from both an interlocutory and a final judgment. The cause was tried before a referee appointed to hear and determine the issues. His report was confirmed, and an interlocutory judgment was entered thereon, by which certain conveyances, mortgages, and transfers of property were declared to be fraudulent and void as against the plaintiffs, judgment creditors of the defendant Leon Cottentin. By such interlocutory judgment another referee was appointed to take and state an account, and determine and report what property and assets, or the proceeds thereof, had come into the hands of the defendants, which should be paid over to a receiver (also appointed in such interlocutory judgment) of the property, assets, and effects of Leon Cottentin, transferred or incumbered by the conveyances or transfers aforesaid. The referee named in the interlocutory judgment made his report, in which he specified what real and personal property of the defendant Leon Cottentin had passed under the conveyances and transfers declared by the interlocutory judgment to have been fraudulent, and also found that the defendants Beadleston & Worz were accountable to the receiver for the value of personal property received by them from the defendant Leon Cottentin in the sum of $3,250, and also for the sum of $406.75; that the defendant Marie Cottentin was accountable to

the receiver for the amount of $3,250, and also for an additional sum of $850; that the defendant Francois Drizal was accountable for the same sum as the defendant Marie Cottentin; but that the real property affected by the fraudulent conveyances had been sold under prior incumbrances, and that no surplus was realized. Upon the coming in of the report, final judgment was entered, confirming it in all respects, and directing the defendants Beadleston & Worz forthwith to pay over and deliver to the receiver the sum of $3,250, and also the sum of $406.75, with interest on both sums from August 23, 1893; and also directing the defendant Marie Cottentin forthwith to deliver to the receiver the sum of $3,250, and an additional sum of $850, with interest from the 24th of May, 1894; and the same direction was made with reference to payment being made by the defendant Francois Drizal. The final judgment then provided that the payment by either of the three parties should be credited to the others, and that full payment of the judgment entered against any defendant, or any part payment by any defendant against whom a judgment had been entered, should operate as a satisfaction or payment pro tanto of the judgment entered against such defendant, both in this action and in another action by other plaintiffs seeking the same relief against the alleged fraudulent conveyances and transfers. The defendants appeal from the whole of the interlocutory and final judgments. The plaintiffs excepted to so much of the report of the referee on the trial of the issues as directed costs to be paid out of the moneys recovered from the defendants, and insisted that such costs should be paid by the defendants personally. The plaintiffs also excepted to portions of the decision of the referee under the interlocutory judgment which affected the amounts to be paid by the defendants, respectively, and insist that the defendants Beadleston & Worz should be chargeable with all amounts, the proceeds of the transferred property. The defendant Ditmar and the defendants Cottentin and the defendant Drizal, on their appeal from the final judgment, gave notice of their intention to bring up for review the interlocutory judgment.

The action was brought to have declared fraudulent and void, and to set aside, a number of conveyances of realty, mortgages, chattel mortgages, and transfers of personal property, all of which property, prior to the 5th of August, 1893, belonged to the defendant Leon Cottentin. The property affected consisted in part of real estate in New Jersey, upon which were then outstanding large incumbrances; also, a restaurant in the city of New York, and its appointments, including a stock of wines, liquors, supplies, and other merchandise used in the business. Leon Cottentin also at that time had certain contracts for furnishing meals to the employés of large corporations having their offices in the city of New York. On the day mentioned, and previously, in the conduct of his business in the New York restaurant, and in supplying food under the contracts referred to, he was assisted by his wife, his daughter, and the defendant Drizal, and he also employed a number of servants in the conduct of his business in the restaurant. Finding, on the day mentioned, that the restaurant enterprise, in which he had invested large sums of money, was not successful, and that he was finan-

cially embarrassed, and unable to pay his debts, he desired to make provision for securing certain of his creditors to the exclusion of others. Thereupon he sought the advice of a firm of reputable lawyers, who at the same time happened to be the legal advisers of some, if not all, of the creditors he wished to protect. As a result of his conferences with his counsel, a deed of trust was made by Leon Cottentin to the defendant Ditmar, who was a clerk in the office of the attorneys referred to, and by that deed of trust certain property at Long Branch, in New Jersey, was conveyed to the trustee to secure eight creditors, named, for indebtedness actually due them, including an indebtedness of $2,782 to the defendants Beadleston & Worz, a New York corporation. In addition to the debt of Beadleston & Worz thus secured by the mortgage on the New Jersey property, there was another indebtedness of Leon Cottentin to that corporation amounting to $5,000. The latter indebtedness is that which gives rise to the most important question in the case. At the same time at which this trust deed was made Leon Cottentin executed and delivered to Ditmar, as trustee, a mortgage which covered the lease of the restaurant premises in the city of New York and the fixtures therein. Two days before, he had executed a mortgage to his wife upon the lease and chattels in the restaurant to secure her debt of $5,220. This mortgage to the wife ranked in advance of the trust mortgage for the benefit of creditors named in the trust deed. Mrs. Cottentin did not join in the deed of the New Jersey property, so that her dower therein was not affected thereby. In some of the instruments there was a provision for paying surplus realized on sales of the property to Cottentin. The instruments thus far referred to did not cover all the property belonging to Leon Cottentin. He had remaining the stock of liquors and wines and supplies to which reference has been made. That merchandise was supposed to be worth in the aggregate, at a rough valuation, about $5,000. Cottentin owed that amount to Beadleston & Worz in addition to the sum mentioned in the deed of trust. Cottentin disposed of this merchandise, and all the chattels, furniture, and fixtures, by transferring them by a bill of sale to Beadleston & Worz. The chattels, furniture, and fixtures were transferred subject to the mortgage of Mrs. Cottentin. The bill of sale from Cottentin to Beadleston & Worz was dated August 3, 1893. On August 5, 1893, Beadleston & Worz made a bill of sale of this same property, subject to the same mortgage, to N. P. Abbott, one of their employés. An inspection of this stock of merchandise was made by an agent of Beadleston & Worz before the transfer was made, and its value was fixed at $5,000. When the property was transferred, the $5,000 indebtedness to Beadleston & Worz was actually canceled. It had existed in the shape of a promissory note, and it was agreed that that note should be surrendered when the transfer of the personal property was made; at least, instructions were given to the attorney at law to make the surrender. Abbott took formal possession of the property; the restaurant business was continued; there was a symbolical delivery of the restaurant to Abbott by turning over the keys to him; the liquor tax.

certificate was transferred to him; but thereafter Leon Cottentin did actually stay upon the premises and manage the business of the restaurant, with substantially the same assistants and in substantially the same manner as before. Nevertheless, Abbott supervised the business, employed Cottentin at a salary of $35 a week, which, however, Cottentin paid himself by drawing a few dollars at a time as occasion required; but the profits of the business, after the transfer to Beadleston & Worz, and until the retransfer, presently to be mentioned, were taken by Abbott for Beadleston & Worz, and are charged against Beadleston & Worz by the referee before whom the issues were tried. Meantime a change had also taken place with reference to the contracts Cottentin had to furnish meals or food to the employés of the several corporations above referred to. All that business had passed into the hands of Mrs. Cottentin and Drizal. There was no specific written transfer of these contracts made, but nominally, at least, that business passed out of the hands of Cottentin as the contractor to furnish meals, which were, however, furnished from the restaurant. The relations of Beadleston & Worz, or Abbott, to the restaurant, the fixtures, and the stock of merchandise, continued until August 23, 1893, when it was ascertained that Pottsberg, the agent of Beadleston & Worz, who made the original appraisement of the merchandise, had put an excessive estimate of value upon it, and thereupon negotiations were had which eventuated in a rescission of the sale and transfer, and the reinstatement of the parties to that bill of sale and transfer in the position they occupied before it was made. Beadleston & Worz retransferred all that they had acquired by that transaction to Leon Cottentin. The debt to Beadleston & Worz was revived, a new note for the amount was given, and, by a consent of the other beneficiaries under the trust deed to Ditmar, Beadleston & Worz were allowed to come in and be secured by that trust deed for the $5,000 note thus given. As an inducement to the creditors to allow this to be done, Mrs. Cottentin released her dower in the real estate in New Jersey. Thereupon Beadleston & Worz seem to have withdrawn from all further connection with the matter. Mrs. Cottentin and Drizal then entered into an arrangement for carrying on the restaurant business, and Leon Cottentin transferred to them his interest, whatever it may have been, in the restaurant and its equipment, but continued as the manager of the business. All these transfers were made before the plaintiffs in this action recovered their judgments, but the debts to them were due and owing from before the 3d of August, 1893.

The foregoing are the material facts to be considered. It is charged in the complaint that all these transfers and transactions were made with a fraudulent intent and purpose; that the defendant Leon Cottentin, being wholly insolvent on the 5th of August, 1893, and the other defendants knowing that he was thus wholly insolvent, entered with them into a scheme having for its object the conveyance to them of everything of which he was possessed, in such manner and with such effect that his debts to them should be secured out of the property conveyed in preference to the claims

of other creditors, and that in the meantime the property so conveyed should continue in the possession and control and management of the defendant Leon Cottentin, and to his use, so that such property might not be seized or taken on execution or process against the said Leon Cottentin by other creditors, and so that the payment of the indebtedness of the other creditors might be hindered and delayed until such time as the defendant Leon Cottentin might be able to pay or compromise or otherwise settle his indebtedness with such unsecured and unprotected creditors. These averments of the complaint charge actual fraud and conspiracy. The referee before whom the issues were tried did not find that a specific agreement was made between the parties with the object or looking to the purpose set forth in these averments of the complaint; but he did find that an unlawful scheme was entered into by all the defendants prior to the making of the alleged transfers, with the intent that the defendant Leon Cottentin should convey to the other defendants all (or substantially all) of his property to secure their claims in preference to the claims of other creditors, including the plaintiffs, "and that at the same time said property so transferred should remain in the possession of and under the control and management of Leon Cottentin, and for his future use, and should not be seized upon or taken by any of the creditors, including the plaintiffs, and with the intent that the payment of such other claims of such other creditors might be hindered and delayed." That referee also decided that the defendant or defendants to whom such alleged transfers are stated in the complaint to have been made aided in the scheme and participated in such intent. The referee thus found, upon the evidence, the elements necessary in law to avoid these instruments. He expressly found mutuality in the design of hindering and delaying creditors, but he also found that every indebtedness secured by all or either of the conveyances, mortgages, or transfers attacked, was a subsisting, valid, enforceable indebtedness; that is to say, he found that, when the alleged scheme was entered into, the defendant Leon Cottentin was indebted to the eight creditors named in the trust deed to Ditmar, and he also found that on August 5, 1893, the defendant Leon Cottentin was indebted to his wife, the defendant Marie A. Cottentin, in the sum of $5,220.

We have, then, to start with in the examination of the case, the fact—which the referee properly found—that all the creditors secured or sought to be secured by the instruments impeached in this action were bona fide creditors. It is not claimed that Leon Cottentin could not lawfully prefer all or either of them by making transfers of or incumbrances upon, or by the delivery of, specific property, either in payment or as security for their debts; nor is it claimed that any delay or hindrance other creditors would be subjected to, by reason of such conveyances, incumbrances, or transfers, would render them ipso facto void; nor is it contended that an ulterior purpose or intent of Leon Cottentin to secure to himself the control and possession of the property transferred or incumbered, until the creditors preferred should resort to the enforcement of their rights under the instruments, would of itself invali-

49 N.Y.S.—42

date those instruments, unless it be the chattel mortgage to Ditmar, as trustee. It is conceded that that intent must have been shared in, in this particular case, by the creditors, or those acting for them, because the creditors took for value. We are not informed of the legal ground upon which the learned trial referee based his decision, except so far as it was founded upon his understanding of the evidence as establishing some scheme or arrangement, entered into, looking beyond the mere security of the creditors, and having for its ultimate object the retention of the property and business in the hands of the debtor Cottentin, safe from the pursuit of other creditors. It would seem that the decision must have been based upon inferences drawn from the general history of the whole transaction and the circumstances of the case. If it were, the inferences were not justified. There is no proof whatever, from the beginning to the end of this record, of any agreement entered into between the preferred creditors and Cottentin to give him any advantage or accommodation, by way of delay or otherwise, out of these various transactions. It is shown, however, that Cottentin himself was looking to such advantage, expected it, and entered into the arrangement with the intention of securing it. That is shown by the testimony of four witnesses, and also by the letter written by one of the plaintiffs, and certified to by Cottentin as being "entirely correct." But his intent is not controlling. These were not voluntary conveyances; that is, not without present consideration. Each one of the creditors secured had a perfect right to receive that security, and Cottentin also had the right to grant it. But if those creditors did not receive the transfers in good faith, if they became parties in any way to his purpose of maintaining possession and control and the use to his own benefit of the property to gain time and keep off his unsecured creditors, then they became parties to the purpose in such a way as to make the conveyance fraudulent, and to require that they be set aside by the court.

In this connection it is proper to state that nothing is to be inferred against the lawful character of the transfers and instruments, and nothing is to be imputed to the preferred creditors by way of assent to or complicity in any ulterior purpose of Leon Cottentin, from the mere fact that some of the instruments provided that, in certain events of default, the surplus arising should be given to Cottentin, or that he should remain in possession under the chattel mortgages until default was made thereon. When the case was before the learned trial referee, he might have been justified in basing his decision upon the provisions of the instruments referred to, for it had been expressly decided in Delaney v. Valentine, 80 Hun, 476, 30 N. Y. Supp. 512, that such a mortgage as that made to Ditmar was invalid, because it contained a resulting trust in favor of the mortgagor, arising from the provision that the overplus should be returned to the mortgagor. That ruling was, however, reversed, and the contrary doctrine announced, by the court of appeals, on an appeal to that tribunal in the same case; the decision of that court having been announced since these appeals were ar-

gued at the bar of this court. This consideration applies to the mortgage on chattels in the Cortlandt street premises, and is of importance only with reference to that feature of the case. Upon considering all the evidence with reference to the general finding of the trial referee that all the transfers and all the instruments sought to be impeached here were fraudulent because of a participation of the creditors preferred in the unlawful intent of Leon Cottentin, we find nothing to justify that finding in any relation which any individual creditor thus preferred had to the subject. It is not shown that any one of them had any participation in any negotiations resulting in those conveyances; the only exception being that, in the matter of the claim of Beadleston & Worz upon the $5,000 note, during parts of the transaction, they were represented by Pottsberg or Abbott. The only circumstance from which knowledge of any ulterior intent on Cottentin's part can be inferred is that the same lawyers represented both the creditors and Cottentin in the whole transaction, and that Ditmar, who was selected as trustee, was a clerk in the office of those lawyers. It is not to be denied that knowledge or notice to the agent of creditors thus preferred would be imputed as knowledge or notice to themselves; but there is nothing on the whole record to show that the attorneys, or Ditmar, actually knew of any such ulterior purpose. Ditmar swears that he did not, and there is no proof, even inferentially, that the attorneys did. The transactions themselves were not of such a character as would necessarily have compelled these attorneys to know that Cottentin had in mind something more than to secure his creditors in a lawful and proper way. That embarrassment would arise and suspicion be excited from the fact that the same attorneys represented both parties to transactions of this character may be true; but it seems to be apparent from this whole record that, each one of the transactions being in itself entirely lawful, there was no good reason why the attorneys could not act for both parties, for the direct object to be accomplished was the security of certain creditors, who were entitled to take the security precisely as they did, and, had they been represented by other attorneys, no question could possibly have arisen of notice or knowledge imputable to them by reason of the connection of their legal advisers with the matter. On the facts of the case, we do not think that any inference of fraudulent intent can be drawn to affect these preferred creditors in the whole series of instruments sought to be set aside.

But, leaving the general aspect of the case, we come to the practically more important matter of the relations of Beadleston & Worz to the transaction, the instruments executed in their favor, and that subsequently made by them, and their attitude to the case with reference to the personal property embraced in the bill of sale to them executed on August 3, 1893. This transaction is separated from the general subject, because the practical result of the litigation has been to charge Beadleston & Worz and Mrs. Cottentin and Drizal with liability and the entry of a money judgment for the value of the merchandise embraced in the bill of sale. The theory of the

plaintiffs with respect to this independent transaction is that, from the time of the delivery of the bill of sale down to the final transfer to Mrs. Cottentin and Drizal, there was one distinctly traceable purpose of putting that merchandise and the restaurant business in such a shape that creditors unprotected of Cottentin could not reach it; and, if the proofs support that contention, the judgment charging these defendants with liability was right. The series of transfers certainly begins with record relations established between Leon Cottentin, Mrs. Cottentin, and Beadleston & Worz, and the last of the record relations effected by the instruments are also between the same parties; for, in the consideration of the independent transactions in which Beadleston & Worz were interested, we regard Abbott as being only an agent of that corporation. The bill of sale to Beadleston & Worz was dated the 3d of August, 1893. The mortgage of Leon Cottentin to his wife upon the lease of the premises in Cortlandt street, where the restaurant business was carried on, was of the same date. There was a consideration for each of those instruments. There can be no doubt of the $5,000 indebtedness of Cottentin to Beadleston & Worz, nor can there be any doubt of Cottentin's indebtedness to his wife. What proof is there of any complicity or intention of Beadleston & Worz to enter into a mere sham transaction with reference to this merchandise, or to enter into complicity with Cottentin to take a mere formal transfer of this property, so that it might be preserved from the pursuit of other creditors of Cottentin? There was a valuable consideration for the bill of sale (Seymour v. Wilson, 19 N. Y. 420; Murphy v. Briggs, 89 N. Y. 450); and if the Beadleston & Worz Company acted in good faith, and merely for the purpose of securing the satisfaction and payment of their debt, a good title was acquired. What was done by it? It had an appraisement made of the value of the stock in trade; procured the liquor tax license to be assigned by proper authority to it; put a man in possession, to whom it transferred its interest, to be held for it. The general supervision of the restaurant business was taken by that man. The net profits accruing from the business from August 3d to August 23d were received by him alone. All these circumstances indicate a bona fide transaction. Not one of them indicates anything else. The only incident that could give them another complexion is the association of the bill of sale with the other transfers and conveyances by which Cottentin disposed of his interests in all the property he possessed, and the fact that, 20 days after August 3d, all of the transactions with reference to the bill of sale were undone, and the restaurant, fixtures, and chattels retransferred to Leon Cottentin. But a reason for that is given, namely, that upon a more careful examination of the articles transferred by the bill of sale of August 3, 1893, it was ascertained that they were very much less in value than the sum at which they had been taken by Beadleston & Worz. When the bill of sale of August 3d was made, there was a complete relinquishment by Beadleston & Worz of the claim upon the $5,000 note. They had taken the bill of sale in satisfaction of that indebtedness. There is nothing in the evidence to indicate

that this was a mere pretense or sham, and when the retransfer was made on August 23, 1893, the original indebtedness was restored, and other security was provided for it, namely, the admission of Beadleston & Worz's claim, thus re-established, into the Ditmar trust, and the putting into that trust, so to speak, of the dower interest of Mrs. Cottentin in the New Jersey property. We cannot find, upon the evidence, that these transactions from the 3d to the 23d of August were merely or partly devices to aid Cottentin in keeping the property in his own hands, so that he would be unmolested by other creditors. On the face of the transaction it seems to be reasonable that Beadleston & Worz were attempting honestly to secure their own claim, and nothing beyond that. If they had shared in the intent imputed to them, they would have continued to hold the stock of goods under their bill of sale, or in the name of Abbott, instead of retransferring it on the 23d of August. The very transaction itself seems to indicate its good faith.

But it is claimed that the fraudulent character of the transaction is to be inferred, as matter of law, from the fact that Cottentin retained possession of the restaurant; that is to say, of the premises upon which the business was carried on, and in which this personal property was located. It is not to be controverted that Cottentin did remain on the premises, apparently in the same position, and with the same relation to the business and the property, he had occupied before the bill of sale was made on August 3d. The retention of possession is sometimes not only a badge of fraud, but raises a presumption of fraud against creditors. But that question of fraud, under the statute, is one of fact, and it arises when the vendee is required to show a valid excuse for leaving the property in the vendor's possession. Finding, as we do, that the sale was not fraudulent, but was honest, it may not be necessary to consider this question of the change of possession at all. 2 Rev. St. p. 136, § 5. It was held in Hanford v. Artcher, 4 Hill, 285, referring to the case of Smith v. Acker, 23 Wend. 653, that a party claiming under a sale or mortgage of personal property not accompanied with a complete change of possession may rebut the presumption of fraud arising from want of delivery and change of possession by proving that the transaction was in good faith and without any intent to defraud creditors,—not by showing some excuse or reason why there had not been a change of possession, but by proper and relevant testimony to show the real bona fides of the transaction. And in Mitchell v. West, 55 N. Y. 107, it was held by the court of appeals that the case of Hanford v. Artcher, supra, settled that point. But, even if it became necessary in this case to furnish a valid excuse for Cottentin still being in apparent possession, it is to be found in the evidence on this record, namely, that Beadleston & Worz, through Abbott, took possession, as far as they could without destroying the business of which they became the proprietors; that they put Cottentin in charge as manager, and paid him a salary; that they took the proceeds of the business, and held that business for the period of 20 days, and until they became satisfied that it was to their interest, regardless of Cottentin, to surrender it

back to him for the consideration of being restored to the position they occupied before they took the bill of sale, and their participation in the Ditmar trust. We think, therefore, that in either aspect of this subject of possession, the defendants Beadleston & Worz have shown their innocent relation to the subject.

There remains for consideration the attitude in which Mrs. Cottentin and Drizal stand to the matters involved in this action. Was the transfer by Cottentin to them, which succeeded the retransfer to him from Beadleston & Worz, made by the parties thereto with intent to hinder and delay creditors? Mrs. Cottentin seems to have had nothing whatever to do personally with this transaction. It was all left to her husband. At the time at which that transfer was made, she left the city of New York to go to Chicago, and really constituted her husband her agent for all the purposes of that transaction. Drizal seems to have had only a nominal interest in the matter, and it is perfectly clear upon the whole record that this transfer was nothing but a step in carrying out the purposes of Cottentin to keep this property in his possession, subject to the incumbrances upon it, as long as he could. We have already seen that none of the creditors secured can be fairly chargeable with knowledge of or complicity in that purpose of his. But the conclusion seems to be irresistible that Mrs. Cottentin was perfectly content to let her husband do whatever he pleased with the property, and she is chargeable with notice of his intention and of his purpose.

We are therefore of the opinion that the judgments should be reversed as to the defendants Beadleston & Worz and Ditmar, and a new trial ordered as to those defendants before another referee, with costs to the appellant to abide the event, and that the judgments should be affirmed so far as the bill of sale and transfer of the merchandise and stock of goods from Cottentin to his wife and Drizal is concerned, with costs to the plaintiffs, to be paid by the defendants Cottentin and Drizal. The plaintiffs' appeal from, the order respecting costs should prevail to that extent. In the view we have taken of the merits of the case, and of the bona fides of the transactions, it is unnecessary to consider any of the other questions arising upon either appeal. All concur.